[No. 57337-9. En Banc. January 9, 1992.]

CERTIFICATION FROM THE UNITED STATES
BANKRUPTCY COURT FOR THE EASTERN DISTRICT
OF WASHINGTON
IN
*In the Matter of* CIPRIANO ESPARZA, ET AL.

TUCKER STARBUCK, *Plaintiff*, v. CIPRIANO ESPARZA,
ET AL, *Defendants.*

252

*Frank L. Kurtz* and *Schwab, Kurtz, Hurley & Lara,* for defendant Esparza.

*Lyon, Beaulaurier, Weigand, Suko & Gustafson,* by *Robert M. Boggs,* for defendant J.R. Simplot Co.

*Timothy J. Carlson* (of *Halverson & Applegate, P.S.*), for defendant Lewis Longley, Inc.

BRACHTENBACH, J. — The United States Bankruptcy Court judge for the Eastern District of Washington certified five questions of unsettled Washington law; the questions

arose in a Chapter 12 bankruptcy proceeding and from an allied adversary proceeding in that court. RCW 2.60; RAP 16.16.

The Order of Certification lists 20 documents and records which the bankruptcy judge deemed material for our consideration. Order of Certification, at 4-5.

Also, we note that the bankruptcy court has held:

> (1) That; as against the bankruptcy estate of Cipriano Esparza, et ux., the statutory landlord lien held by Tucker Starbuck is void; and
>
> (2) That the statutory lien is preserved as against the remaining creditors, for the benefit of the bankruptcy estate of Cipriano Esparza, et ux.
>
> In effect, this means that the landlord lien rights formerly asserted by plaintiff Tucker Starbuck in this lawsuit are property rights of the Chapter 12 estate of Cipriano Esparza and these rights are now represented in this lawsuit by defendant Cipriano Esparza as debtor-in-possession.

Order of Certification, at 4. This puts the controversy in perspective and explains why Cipriano Esparza's brief takes positions and argues for or against the various claims of the four contestants.

The certified record includes a statement of the following facts:

> A. *The Crop, Its Harvest, and Its Proceeds*. The crop and the proceeds which are liened (or argued to be liened) are a potato crop grown during calendar year 1988, on property commonly referred to as Circle 311 of Sandpiper Farms in Benton County. Other farm crops grown elsewhere by the debtor are not at issue in this litigation. Defendant Esparza had two contracts with the J.R. Simplot Company, Food Division, for the sale of potatoes grown by the debtor in 1988. Harvest of the potatoes in question began between September 10, 1988 and September 15, 1988, and was completed by September 25, 1988. All said potatoes were delivered to J.R. Simplot plants in Hermiston, Oregon and/or Caldwell, Idaho for processing by September 26, 1988 and were fully commingled with other potatoes and were not identifiable.
>
> Defendant Esparza was entitled to proceeds from the Simplot Food Division in the approximate amount of $106,000.00. Pursuant to the contracts, the debtor was to receive half of the proceeds within thirty (30) days of delivery and the remaining half by February 1, 1989. Defendant Esparza received checks totalling approximately $53,000.00 before the

end of October, 1988. Before the remaining proceeds could be distributed in February, 1989, a dispute arose amongst the various lien claimants over entitlement to the proceeds. Subsequently, the debtor filed a petition for relief under Chapter 12 of Title 11 on April 3, 1989. At the present time, J.R. Simplot Company, Food Division, has placed in a trust account the remaining proceeds. Defendant Esparza never cashed the checks he received in October of 1988, and those funds have also been paid into trust.

B. *Tucker Starbuck Company's Claim.* On December 18, 1987, Esparza leased approximately 125 acres of farm property from Tucker Starbuck. The lease was for a period of one crop year, and, according to its terms, expired "after harvest." Rent in the amount of $84,265.00 was due December 20, 1988, regardless of crop yield. Starbuck recorded the lease in Benton County eleven (11) days after it was executed. In the fall of 1988, Esparza harvested and sold the potato crop. Starbuck, on December 18, 1988, filed a form UCC-4 with the Washington State Department of Licensing. The statement was filed prior to the rent due date as provided in the lease and during the period when the lease was in effect. The lien filed by Tucker Starbuck contained a typographical error, made by an employee of Tucker Starbuck, and the surname of the debtor was misspelled as follows: ESPARSA (correct spelling is "ESPARZA".)

C. *J.R. Simplot Company's Claim.* J.R. Simplot Company furnished fertilizer and other agricultural chemicals to Mr. Esparza for his 1988 potato crop on Circle 311. From March 4, 1988 to August 30, 1988, on numerous occasions Mr. Esparza placed orders for fertilizer and chemicals with Simplot based upon recommendations made by Simplot. Each transaction was separate and Simplot was under no obligation to sell to Mr. Esparza. The total unpaid value of the products delivered during the above period of time was $69,786.50.

One June 16, 1988, J.R. Simplot filed its crop lien pursuant to RCW 60.11.040. The lien form (UCC-4) that was filed by Simplot had a space preceded by a dollar sign ($___). The person preparing the UCC form for Simplot wrote the number $34,924.61 in that space.

D. *Central Valley Bank's Claim.* On March 9, 1987, Central Valley Bank filed a UCC financing statement claiming an interest in all of the debtor's crops; crops of every kind, whenever and wherever located, to be grown, growing, or that have been produced, accounts, contract rights and general intangibles arising from the sale of the collateral and afteracquired collateral. All collateral under the financing statement is to secure present and future loans and advances. On December 30, 1987, Central Valley Bank loaned 1988 farm operating funds to Esparza. At that time, Central Valley and

Esparza executed a security agreement granting the bank a secured interest in, among other things, all crops grown on specifically described real property, all inventory, all chattel paper, all accounts and contract rights, all general intangibles, and all crops, including after acquired collateral and proceeds. The bank loaned the debtor approximately $23,000.00. The December 30, 1987, security agreement, however, omits any legal description of Circle 311. Instead, it describes other farming property of the debtor. Central Valley Bank claims a perfected security interest in the proceeds of Circle 311's severed crops.

E. *Lewis Longley, Inc.'s Claim*. In April of 1988, Lewis Longley, Inc. furnished $16,463.79 of Russett Burbank potato seed to Esparza, which seed was used entirely on Circle 311. The seed price was $6.00 C.W.T., which was the market price at that time and location. On September 9, 1988, Lewis Longley, Inc. sent its crop lien to the Department of Licensing and the lien was filed on September 12, 1988. Lewis Longley also sent Esparza a copy of its lien statement by certified mail, return receipt requested, within ten days after the filing, which copy conformed to the requirements of RCW 60.11.040(2).

Order of Certification, at 5-8.

The Order of Certification poses the legal issues as follows:

In order to dispose of the above referenced case and adversary proceeding pending in the Bankruptcy Court for the Eastern District of Washington, it is necessary to ascertain the local law on the following questions:

(1) Is the landlord lien of Tucker Starbuck valid and perfected, despite the fact that Cipriano Esparza's name was misspelled on the lien statement?

(2) Is the landlord lien of Tucker Starbuck valid and perfected, despite the fact that it was not filed until after the crop was harvested?

(3) Does Central Valley Bank have a perfected security interest in Circle 311's severed and harvested crops or the accounts generated by the sale of those crops?

(4) Is the amount of defendant J.R. Simplot's lien claim $69,786.50 plus interest, or is it limited to $34,924.61 plus interest?

(5) What are the relative priorities among and between the parties?

The local law on these questions has not been clearly determined.

Order of Certification, at 9.

ISSUE 1
### Effect of Misspelling Debtor's Name in Claim of Lien

The statute prescribes the contents of a claim of lien. It provides: "The statement shall be in writing . . . and shall contain *in substance* the following information: . . . (b) The *name* and address of the debtor [tenant here]". (Italics ours.) RCW 60.11.040(2)(b).

The correct spelling of the debtor's name is Esparza. The claim of lien incorrectly spelled the name with an "s" rather than a "z", *i.e.*, Esparsa, rather than Esparza.

 The modifying phrase "in substance" must be given meaning. Obviously, the intent is to validate something less than absolute exact precision of spelling. The whole purpose of requiring the filing of a claim of lien and prescribing its contents is to give notice to those who do, or should do, a reasonable search of the appropriate records. Thus, is a lien claim which names the debtor as Esparsa *in substance* sufficient to impart notice to one searching the correct spelling under Esparza?

There are two principles, one statutory and one of the common law, which mandate the conclusion that this minor misspelling does not invalidate the lien.

The Uniform Commercial Code (U.C.C.) is helpful in establishing the applicable standard. The U.C.C. is not applicable to landlord liens, but there is a direct interrelationship, and by analogy the U.C.C. is helpful. First, the crop lien statute contemplates uniform search procedures under the crop lien statute *and* the U.C.C. The crop lien statute, RCW 60.11.040(3), specifically references filing of and search for both crop liens and financing statements filed pursuant to Article 9 of the Uniform Commercial Code, RCW 62A.9-401.

The crop lien statute requires that the claim contain *in substance* the prescribed information, including the debtor's name. The U.C.C. requires that the prescribed information be *substantially* as set forth in the statute, including the

debtor's name. RCW 62A.9-402(3). In sum, the requirements of the crop lien statute and the U.C.C. are identical as they should be because each serves the same function.

The U.C.C. then sets a standard which should be persuasive and determinative here. RCW 62A.9-402(8) provides that a financing statement substantially complying with the U.C.C. "is effective even though it contains minor errors which are not seriously misleading."

The leading Uniform Commercial Code commentators make clear that the inquiry is "whether a reasonably diligent searcher would be likely to discover a financing statement [claim of crop lien] indexed under the incorrect name." J. White & R. Summers, *Uniform Commercial Code* § 23-16, at 958 (2d ed. 1980). Those writers conclude:

> Inevitably, such cases lead to improper indexing but most of the courts have been willing to tolerate incorrect names and incorrect indexings as effective under 9-402(8) when in their judgment the inaccuracies were not "seriously misleading." We believe this to be the proper approach and encourage the courts to focus here on whether a reasonably diligent searcher would be likely to discover a financing statement indexed under the incorrect name.

J. White & R. Summers § 23-16, at 957-58.

There is evidence that a search by the Department of Licensing (DOL), the filing depository, would not reveal this filing because of the misspelled name. The reason given by a DOL employee was that "our searches are done by computer. . . . It brings up all searches with those exact spellings." Affidavit of Wheelock, at 2. The mechanical procedures employed by a government bureau do not determine whether a particular claim of lien contains in substance the statutory elements. In the case of *In re Strickland*, 94 Bankr. 898, 903 (Bankr. N.D. Miss. 1988), the court points out that the issue is whether a technically defective financing statement is seriously misleading. If it is not seriously misleading, the court must ignore the fact that a search by a government employee, using the agency's methodology, would not disclose the technically defective filing. The court held:

A financing statement cannot be misleading to some but not to others. If a defective financing statement is not misleading, it imparts notice to the world.

*Strickland,* at 903.

In addition, the common law provides a universally accepted principle which validates this filing despite the minor error in spelling. The doctrine is idem sonans; its purpose and philosophy is consistent with the standard set by the U.C.C. and applicable to the crop lien statute.

The principle of idem sonans is set forth with detail and accuracy in *Kelly v. Kuhnhausen,* 51 Wash. 193, 194, 98 P. 603 (1908) as follows:

> "The rule of idem sonans is that absolute accuracy in spelling names is not required in legal documents or proceedings, either civil or criminal; that if the name as spelled in the document, though different from the correct spelling thereof, conveys to the ear, when pronounced according to the commonly accepted methods, a sound practically identical with the sound of the correct name as commonly pronounced, the name as thus given is a sufficient designation of the individual referred to, and no advantage can be taken of a clerical error." *Hubner v. Reickhoff,* 103 Iowa 368, [370,] 72 N. W. 540, 64 Am. St. 191 [(1897)].[1]

The *Kelly* case concerned a tax foreclosure. The court held that service by publication naming "Minnie E. Tilter" was sufficient as against the person whose correctly spelled name was "Tiller", not "Tilter". The court noted that the only variance was one letter; the same is true here. The court noted the given name was the same. That is true here. The given name of Cipriano was accurately stated.

The principle was applied in *State v. Lindsey,* 150 Wash. 121, 129, 272 P. 72 (1928), holding Lindsay was idem sonans with Lindsey.

The cases applying idem sonans are legion. A few examples show that the minor variance present here should not invalidate the lien claim. The following are illustrative of misspelled names held to be sufficiently similar to be

---

[1]There are insignificant textual differences between the language quoted in *Kelly* and that reported in the Iowa Reports.

regarded as the same: (1) "Erwan" and "Irwin". *Acme Prods. Co. v. Dunlap*, 108 S.W.2d 274 (Tex. Civ. App. 1937). (2) "Goldstine" and "Goldstein". *Goldstine v. State*, 234 Ind. 388, 126 N.E.2d 581 (1955). (3) "Okes" and "Oakes". *State v. Reynolds*, 212 N.C. 37, 192 S.E. 871 (1937). (4) "Rouch" and "Rauch". *Rauch v. Immel*, 55 Ohio App. 71, 8 N.E.2d 569 (1936).

The doctrine generally is applicable to documents in public records. *Fidelity Acceptance Corp. v. House*, 210 Minn. 220, 297 N.W. 705 (1941) (where "House" and "Hause" were held sufficiently similar). It has been applied in foreclosure of mechanics' liens. Where the title to real property was in "Earnest", a lien recorded against "Ernest" was valid. *Gleich v. Earnest*, 36 Ohio App. 326, 173 N.E. 212 (1930). As noted above, our court has applied it to a tax foreclosure and to a criminal proceeding.

Here we have the correct spelling of the first or given name. Only one letter was involved in the misspelling and that is near the end of the name. The names sound alike or sufficiently alike that their legal status should be the same. The document in which the misspelling occurred is intended to provide notice, not to be wholly sufficient in and of itself.

These circumstances all dictate application of the doctrine of idem sonans. Ample authority, here and elsewhere, justifies its application. *See* R. Brachtenbach, *Idem Sonans*, 34 Title News 6 (July 1955). In fact, the record shows that a private credit researcher did locate the misspelled name by using a phonetic search rather than one limited to the exact spelling. Deposition of S. Lee, at 5-10.

### Issue 2
### Time of Filing of Landlord's Claim of Lien

The debtor-tenant leased the involved cropland from Tucker Starbuck. The lease was for one crop year with a cash rent payment due December 20, 1988. The potato harvest was completed in September. The landlord's claim of lien was filed December 18, 1988.

The statute is unclear as to when a landlord's lien must be filed. Other lien claimants must file *after* commencement of delivery of supplies or provision of services and *before* completion of the harvest. RCW 60.11.040(1). However, the landlord is excepted from that time frame because that time requirement is preceded by this phrase: "Except as provided in subsection (4) of this section with respect to the lien of a landlord". Subsection (4) is silent as to the time of filing; it simply provides that "[a]ny landlord claiming a lien . . . for rent shall file a statement evidencing the lien with the department of licensing." RCW 60.11.040(4).

■ Thus, it is clear that the time for filing a landlord's lien is not limited to the time period provided for other lien claimants. We conclude that the landlord's lien need not be filed before completion of the harvest of the affected crop. However, as discussed hereafter, priority of the landlord's lien is determined by the time of filing.

ISSUE 3
Claim of Central Valley Bank

Central Valley Bank (CVB) claims a perfected security interest in the *proceeds* of the harvested crop. As recited above, CVB filed its financing statement months before any of the other claimants were involved in these transactions. However, CVB's security agreement did not describe the real estate upon which the potato crop was grown.

Central Valley Bank advances two theories. The first theory is that CVB qualifies as a "supplier". Therefore, CVB argues it has a supplier's lien under RCW 60.11, quite apart from any U.C.C. security interest. Brief of Esparza, at 17. "Supplier" is defined as follows:

> "Supplier" includes, but is not limited to, a person who furnishes seed, furnishes and/or applies commercial fertilizer, pesticide, fungicide, weed killer, or herbicide, including spraying and dusting, upon the land of the grower or landowner . . ..

Former RCW 60.11.010(4).

■ CVB's interpretation would equate "supplier" with a lender who furnishes funds for the debtor to be able to

acquire seed, fertilizer, etc. The statutory definition cannot be expanded that far. By definition the "supplier" is one who furnishes or applies specified supplies or services, not one who loans money to the farmer to acquire such supplies or services.

This conclusion is supported by the reference in RCW 60.11.020(2) to a lien for the "purchase price" of the supplies or services.

The second argument advanced by CVB is more complex. Central Valley Bank asserts a perfected security interest in the *proceeds* of the crop as distinguished from an interest in the growing crop itself. The precise issue is whether an otherwise perfected security interest in crops *and* their proceeds is invalidated because the security agreement does not contain a description of the land concerned. We assume, without deciding, that the language in the security agreement is sufficient to describe proceeds of the harvested crop. There may be questions whether these particular "proceeds" were accounts, contract rights, etc., but those questions are not raised here.

Central Valley Bank's argument comes from two separate sections of the U.C.C. RCW 62A.9-203 describes, *inter alia*, the formal requisites of a security agreement. Specifically, there must be a description of the collateral "and in addition, when the security interest covers crops growing or to be grown . . . a description of the land concerned". RCW 62A.9-203(1)(a).

The next U.C.C. section, RCW 62A.9-204(1), authorizes after-acquired collateral to secure the debt. There is no requirement in that section of a description of the land if the after-acquired collateral is proceeds of a severed crop.

An examination of the security agreement signed by the debtor in favor of CVB demonstrates how broadly it described the collateral given as security. Affidavit of Cleveringa; exhibit C. The description of real estate does not include the subject real estate, but the collateral includes (a) all accounts and contract rights, (b) all general

intangibles, (c) all crops, and (d) all farm products. Paragraph 14(b) describes as collateral, among other things, "All proceeds (including insurance proceeds) from the sale or other disposition of any of the property described above". Affidavit of Cleveringa; exhibit C.

The wide scope of the collateral is carried over into the financing statement. It describes collateral wherever located, together with accounts, contract rights and general intangibles arising from the sale or other disposition of collateral, and crops of every kind. Affidavit of Cleveringa; exhibit D.

■ The financing statement, as contrasted to the security agreement, need not include a description of the land on which crops are growing or to be grown. It is sufficient if the financing statement describes either the items of collateral *or* the types of collateral. RCW 62A.9-402(1).

The financing statement must include a description of real estate only when the collateral is of the type specifically described in the statute, *e.g.*, timber to be cut or minerals. RCW 62A.9-402(1), (5). It does not require a description of the real estate when the collateral is crops or the proceeds of crops.

With this background we can examine the case law concerning a claim to a secured interest in the proceeds of crops when the security agreement does not contain the requisite land description. There appears to be no Washington case, but there are decisions from other jurisdictions.

There is persuasive authority recognizing the difference between growing crops and harvested crops or their proceeds. It is this difference, critical here, which is argued by the parties.

A thorough analysis is contained in *In re Roberts*, 38 Bankr. 128, 133 (Bankr. D. Kan. 1984). The holding is stated:

> Because severed crops are not growing crops, the real estate description [of the statute] . . . is unapplicable [*sic*], and in order to perfect a security interest in the severed and stored

crop a financing statement [or security agreement] does not have to contain a description of the real estate.[2]

The *Roberts* holding has been adopted by other courts. *United States v. Smith*, 832 F.2d 774, 777 (2d Cir. 1987). *Accord, In re Nave*, 68 Bankr. 139 (Bankr. S.D. Ohio 1986); *Bank of Cresbard v. Lindhorst Farms, Inc.*, 78 Bankr. 1002, 1004 (Bankr. D.S.D. 1987); *In re Sekutera*, 62 Bankr. 387, 390 (Bankr. D. Neb. 1986); *In re Klipfer*, 62 Bankr. 290, 295 (Bankr. S.D. Ohio 1986). The *Klipfer* court found the *Roberts* analysis to be "thoughtfully written, conceptually sound and highly persuasive."

The court in *In re Waters*, 90 Bankr. 946, 965 (Bankr. N.D. Iowa 1988) expressed "serious reservations" about the holding in *Roberts*, but distinguished it and other like cases because the security agreement in *Waters* limited security to the crops grown on particular real estate which was erroneously described. Therefore, it is not authority here. Holding contrary to *Roberts* and other cases cited above is *Western Ohio Nat'l Bank & Trust Co. v. Continental Grain Co.*, 33 Ohio App. 3d 210, 515 N.E.2d 20 (1986), a case never cited since publication. Without much reasoning it held that a real estate description is needed even if the security interest is only claimed in the harvested crop. The case is not persuasive.

■ Thus, we hold that a security interest may exist in harvested crops or their proceeds even though the lack of a description of the real estate would prevent attachment of a security interest while the crops were growing or to be grown. This does no harm to the scheme of the U.C.C.; in fact, it is in harmony with the U.C.C. The present version of the Washington U.C.C. does not require a land description in the financing statement. RCW 62A.9-402. The obvious

---

[2]The opinions reflect the various statutory requirements as to the document in which the real estate description must appear. In Washington it is required in the security agreement, but not in the financing statement. RCW 62A.9-203(1); RCW 62A.9-402(1), (3). The principle is the same regardless of the particular statutory requirement.

purpose is to put one upon notice of a claimed security, but not to provide enough or even sufficient notice of the exact details of what is covered. That conclusion is readily apparent because RCW 62A.9-402(1) requires the name and address of the secured party "from which information concerning the security interest may be obtained".

Proper inquiry to the secured party would reveal what collateral was given as security. If the security included crops growing or to be grown, an adequate description of the land would have to be in the security agreement. However, additional inquiry would be necessary to determine whether the security agreement included crop proceeds, however described, after the crops were harvested. Such inquiries are consistent with and required by the "notice" purpose of the financing statement. Central Valley Bank has a perfected security interest in the crop proceeds to the extent discussed hereafter.

We emphasize that our analysis and holding regarding the crop proceeds are limited to the facts and questions certified and the arguments presented. Other U.C.C. issues may be present.

ISSUE 4
Monetary Amount of Simplot's Lien

The debt owed Simplot and the lien it claims is the amount of $69,786.50. The problem arises from the statement of lien claim filed by Simplot which is on the form adopted by the DOL.

The DOL form, according to instructions printed thereon, can be used for a crop lien (RCW 60.11) *or* a processor and preparer lien (RCW 60.13). The DOL form provides a blank space ($___) for insertion of the dollar amount claimed. However, the crop lien statute does not require a statement of the amount claimed, whereas the processor and preparer lien statute does require a statement of the amount claimed. RCW 60.11.040(2)(a)-(f); RCW 60.13.040(2)(a).

Thus, the crop lien statute does not require a statement of the dollar amount. The DOL form is clear that only a preparer and processor lien must state the dollar amount.

However, Simplot did fill in the blank ($___), unnecessarily as shown above, with an amount less than eventually claimed. Is Simplot limited to that amount despite the lack of any authority requiring such statement? Perhaps a theory of estoppel could be asserted by a competing creditor, but no party hereto makes any such claim. Perhaps, under federal bankruptcy law, there could be such an assertion by a trustee as the "hypothetical lien creditor", but we are concerned only with state law, and in any event, such question was not certified.

There is no applicable law nor reason in fact here to limit the amount of Simplot's lien. It is valid for the full claim of $69,786.50.

## Issue 5
### Priorities

The crop lien statute provides for determination of priorities among conflicting liens and security interests. Former RCW 60.11.050(1) provides that each shall rank in accordance with the time of filing, but makes three exceptions, contained in subsections (2), (3) and (4) of former RCW 60.11.050. Subsection (2) relates to priority for work and labor claims and is not applicable here. Subsection (3) may be applicable to CVB and is discussed hereafter.

The most perplexing question is the priority to be accorded the landlord lien. The starting point for analysis is former RCW 60.11.050(4) which provides:

> A lien or security interest in crops otherwise entitled to priority pursuant to subsection (1) of this section shall be subordinate to a properly filed landlord's lien. A landlord's lien shall retain its priority if refiled within six months prior to its expiration.

Thus, the priorities of crop liens and security interests are determined by the time of filing, RCW 60.11.050(1), except they are "subordinate to a properly filed landlord's lien." Former RCW 60.11.050(4).

The facts of this case illustrate the puzzle which arises from the imprecise language of RCW 60.11. The other crop liens and the security interest of CVB were all filed before the landlord's lien was filed. The obvious question is whether those earlier interests are subordinate to the lien of the landlord?

Further examination of the statute and facts is necessary.

RCW 60.11.020(1) grants the landlord a lien upon the crops for the cash rental payment for no more than 1 year's rent due or to become due within 6 months following harvest. This lease fits that statute as it provided for a single cash rental payment of $84,265, payable on or before December 20, 1988, within 6 months following the September harvest. The landlord's claim of lien was filed December 18, 1988. Affidavit of Cleveringa; exhibits F, G.

As discussed above, lien claimants, other than the landlord, must file before completion of the harvest. RCW 60.11.040(1). However, the statute is silent as to when a landlord's lien must be filed. RCW 60.11.040(4) provides that any landlord claiming a lien under this chapter for rent shall file a statement evidencing the lien with the Department of Licensing.[3]

A landlord can claim a lien on future crops because the statute makes a single filing effective for a lease up to a 5-year period. RCW 60.11.040(4). However, the lien on any one year's crop is limited to no more than 1 year's rent due or to become due within 6 months following harvest. RCW 60.11.020(1).

Despite the inclusive language in former RCW 60.11.050(4) stating that prior liens or security interests are subordinate to a landlord's lien, we conclude that valid suppliers' liens or perfected security interests have priority according to their time of filing when filed prior to the filing of the landlord's lien. That is, filing of a landlord's lien is necessary to establish its date of priority when there are

---

[3]As noted above, the lease was recorded with the County Auditor. That constituted notice under the prior law, RCW 60.12, repealed by Laws of 1986, ch. 242, § 17, p. 866.

valid security interests or crop liens filed prior to the time of filing the landlord's lien. This conclusion superficially appears contrary to the language of the statute, but is explained by consideration of the whole scheme of the crop lien statute and the U.C.C.

Notice is the cornerstone of the crop lien statute and the U.C.C. The U.C.C. requires filing of a financing statement in the public records to perfect a security interest with exceptions not relevant here. RCW 62A.9-302(1). The contents of a financing statement are designed to put anyone on notice that specified types or items of collateral are subject to a security interest. The nature and extent of the debt secured need not be stated. Instead the name and address of the secured party must be provided so that "information concerning the security interest may be obtained". RCW 62A.9-402(1). A crop lien claim is equally abbreviated. The amount of the debt need not be stated. RCW 60.11.040(2). It is appropriate to consider the notice provisions of both the crop lien statute and the U.C.C. because the statutes are specifically interrelated. RCW 60.11 throughout recognizes security interests against the crop which arise under the U.C.C.; former RCW 60.11.010(3) incorporates a definition from RCW 62A.9. Similarly, the code in RCW 62A.9-310(3) references the crop lien statute.

Further, there is clear evidence that crop liens and perfected security interests prior in time to filing of the landlord's lien are not subordinate thereto. While RCW 60.11.050(4) seems to provide priority to the landlord by making other interests subordinate thereto, it first must be noted that those prior in time are subordinate only to a properly *filed* landlord's lien. Former RCW 60.11.050(4). Second, a separate section of the statute negates the idea that the landlord has priority regardless of earlier filings of liens or security interests. RCW 60.11.030 is quite clear in providing that all liens, including the landlord's, shall attach to the crop and identifiable cash proceeds *only upon filing*.

Next, the requirement of notice by filing, including the landlord's claim, is evidenced by RCW 60.11.040(3). That

section directs the Department of Licensing to prescribe standard forms and uniform procedures for crop liens (there is no exclusion for a landlord's crop lien) and U.C.C. financing statements "so that one request will reveal *all* filed crop liens and security interests." (Italics ours.) RCW 60.11-.040(3).

Equally telling is the provision in RCW 60.11.040(4) that a landlord who has a right to a share of the crop, as rent, may place suppliers on notice by filing evidence of such interest in the same manner as provided for filing a landlord's lien. That notice requirement ties to the provisions of RCW 60.11.020(2). If a landlord has automatic priority by virtue of the subordination language of RCW 60.11.050(4), it would be unnecessary to require such notice by filing.

The statute is ambiguous and inconsistent. As shown above, all the liens of RCW 60.11 attach only upon filing. Priority is given only to a properly filed landlord's lien. Giving priority to an unfiled landlord's lien over filed suppliers' liens and perfected security interests would effectively negate the underlying concept of notice which is essential to the functioning of the crop lien statute and the Uniform Commercial Code.

Finally, we must consider what portion of CVB's claim will be recognized. The problem arises from former RCW 60.11.050(3) which provides that a security interest or lien which has priority because of its time of filing is subordinate to a later filed lien or security interest to the extent that obligations secured by the earlier filed lien or security interest were not incurred to produce the subject crops.

This question cannot be answered from the certified record. On December 30, 1987, CVB loaned approximately $23,000 to debtor Esparza for 1988 farm operating expenses. There is no factual determination of what part of the CVB loan was used to produce the crop in question. CVB's claim to crop proceeds has its relative priority only to the extent that the borrowed funds were used to produce this particular crop. Former RCW 60.11.050(3). The bankruptcy judge made no finding on this question. We do know from the

record that the security agreement granted a security interest in crops other than those here concerned. Only when it is determined what funds were used to produce the subject crop can the amount of CVB's claim herein be determined.

The priorities are ranked according to time of filing, thus: (1) Central Valley Bank, but only to extent that loaned funds were used to produce the subject crop, an amount to be determined in bankruptcy court; (2) Simplot lien in the full amount due; (3) Lewis Longley, Inc.; and (4) landlord's lien.

DORE, C.J., and UTTER, DOLLIVER, ANDERSEN, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.