**In re KEVIN W. EMERICK FARMS, INC., Debtor.**

**FIRSTAR BANK BURLINGTON, N.A., Plaintiff,**

v.

**STARK AGRICULTURAL SERVICES, INC. and Intervenors Kevin W. Emerick Farms, Inc. and PHI Financial Services, Inc., Defendants.**

**In re Kevin W. EMERICK and Sherry Ann Emerick, Debtors.**

**FIRSTAR BANK BURLINGTON, N.A., Plaintiff,**

v.

**STARK AGRICULTURAL SERVICES, INC., Defendant.**

**In re SIMON KENTON FARMS, INC., Debtor.**

**FIRSTAR BANK BURLINGTON, N.A., Plaintiff,**

v.

**STARK AGRICULTURAL SERVICES, INC., Defendant.**

Bankruptcy Nos. 94–81957, 94–81958 and 94–81959.

Adv. Nos. 95–8030, 95–8031 and 95–8032.

United States Bankruptcy Court, C.D. Illinois.

Oct. 3, 1996.

---

Robert Lindstrom, Mustain Lindstrom & Henson, Galesburg, IL, for Firstar.

Charles E. Covey, Andrew W. Covey, Peoria, IL, for Stark.

Barry M. Barash, Barash & Stoerzbach, Galesburg, IL, for Debtors.

## OPINION

WILLIAM V. ALTENBERGER, Chief Judge.

Kevin W. Emerick (KEVIN) and Sherry Ann Emerick (SHERRY) are husband and wife. In 1992 and 1993 they farmed as two different legal entities. As individuals they farmed under the name Kevin Emerick Farms or Emerick Farms. They also farmed through Simon Kenton Farms, Inc. (SIMON KENTON) of which SHERRY is the sole shareholder. In April of 1993, Kevin W. Emerick Farms, Inc. (KEVIN EMERICK) was formed, with KEVIN being the sole shareholder. On September 26, 1994, KEVIN and SHERRY, SIMON KENTON and KEVIN EMERICK filed separate Chapter 11 cases in bankruptcy.

The ultimate determination before the Court is which of three creditors, FIRSTAR BANK BURLINGTON, N.A. (FIRSTAR), STARK AGRICULTURAL SERVICES,

INC. (STARK), or PHI FINANCIAL SER-VICES, INCORPORATED (PHI), has a prior security interest on cattle owned by KEVIN, machinery and equipment owned by KEVIN and SIMON KENTON, and 1993 crops grown by KEVIN and SIMON KENTON. PHI'S claim is only against the 1993 crops grown by SIMON KENTON. No challenge is made to PHI's secured status, but it will have priority only if the security interests of FIRSTAR and STARK failed to attach.

On June 18, 1992, STARK took a promissory note, signed by KEVIN, SHERRY, and SIMON KENTON. It provided in part as follows:

> SECURITY FOR LOAN: The amounts outstanding and to become outstanding hereunder and any future loans and advances shall be secured by all growing crops or crops to be grown by the undersigned as will all U.S. Dept. of Agriculture payments to the undersigned based upon participation in any U.S.D.A. program pertaining to the 1992 and subsequent crop years. Collateral also includes as security such other security agreement or agreements as may be in effect from time to time, and such other and additional security instruments as the Creditor may deem necessary at any time, which the undersigned parties hereby agree to deliver upon the request of the Association.

(STARK Ex. # 1) There was no space available for a description of real estate. Nor was there any added or attached.

Also on June 18, 1992, STARK took a security agreement, signed only by KEVIN, which granted STARK a security interest in:

> All livestock and their increases, replacements and substitutions; all farm machinery, implements, equipment, cars, trucks, assessions and accessories; (All inventories, grains, feeds, seeds, fertilizer and accounts receivable) now owned and hereafter acquired of any of the above described property. Also, all government payments including, but not limited to, deficiency payments, CCC loan proceeds and PIK Certificates.

and in paragraph 5 provided in part as follows:

> 5. If the Collateral is to be attached to real estate, a description of the real estate is as follows: _____ and the name of the record owner is _____

The spaces for filling in the description of the real estate were left blank. (STARK Ex.# 2)

Finally on June 18, 1992, STARK took financing statements, signed by KEVIN, SHERRY and SIMON KENTON which did have legal descriptions of the real estate attached, which described the collateral as follows:

> All growing crops or crops to be grown, including corn, soybean, hay and oats, and proceeds thereof on land owned or operated by Debtors located in the following tracts: See EXHIBIT A for description of land. And all Debtors farm equipment located in Sec. 12, 20 and 19 in Henderson Co, Il.

An attachment to the financing statements defined collateral to include after-acquired crops, farm products, and inventory. (STARK Ex.# 3 to # 5)

Two years later, on July 20, 1994, STARK took a second security agreement signed by KEVIN, SHERRY, SIMON KENTON, and KEVIN EMERICK. (STARK Ex.# 34) This second security agreement contained the following language concerning farm products:

> X Farm Products: All farm products including, but not limited to:
>
> (a) all poultry and livestock and their young, along with their products, produce and replacements;
>
> (b) all crops, annual or perennial, and all products of the crops; and
>
> (c) all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.
>
> X The secured property includes, but is not limited by, the following: See attached Exhibit A (The Exhibit to the Form UCC–2 Financing Statement dated June 18, 1992 & June 13, 1994) and the 2 page additional Exhibit "A" setting forth the description of the farm real estate on which growing crops are located, which Exhibits are

attached hereto and by reference made a part hereof by this reference.

**This agreement covers timber to be cut, minerals (including oil and gas), fixtures or crops growing or to be grown, the legal description is:**

Debtors, and each of them, and secured party acknowledge that secured party previously received a security interest in the collateral herein described for the 1994 crop year. The forms UCC–1 that were prepared and filed in June of 1994 reflected signature by all relevant Debtors, and it was the intention of the parties that said fully executed forms UCC–1 represented both the Security Agreement as well as the Financing Statement perfecting the intended grant of said security interest. This Security Agreement is executed to clarify the previously granted security interest in said collateral as described in the forms UCC–1 filed in 1994. At all relevant times the Debtors intended and believed that the execution of the Financing Statements in 1994 (with attached exhibits also executed) was sufficient to grant said security interest.[1]

STARK also took a second set of financing statements (STARK Ex.# 35 to # 40) filed on June 13th or 15th, 1994, which as to the description of the collateral were identical to the descriptions found in the 1992 financing statements (STARK Ex. # 3 to # 5) except they contain a handwritten notation " & June 13, 1994."

FIRSTAR's Security Agreement taken March 12, 1993, (FIRSTAR Ex.# 4), signed by KEVIN, SHERRY, and SIMON KENTON, after claiming a security interest in crops, provided as follows:

2. REAL ESTATE. The following is a description of the real estate where any Collateral which is crops is growing or is to be grown and where any Collateral which is fixtures, timber to be cut or minerals is located or is to be located in _____ County, Iowa (the "Real Estate") (attach schedule if necessary): _____. Such locations

will not be changed without prior written consent of Secured Party. The record owner of the Real Estate, if other than Debtor, is: SEE ATTACHED EXHIBIT "A"

The spaces for filling in the county designation and legal description(s) were left blank. However, the financing statements given to FIRSTAR by the Debtors all contain a county designation and legal description(s) (FIRSTAR Ex. # 5 through 10). In addition, FIRSTAR took an attachment which also contained a county designation and legal description (FIRSTAR Ex. # 30). FIRSTAR's lending officer testified that all these documents were taken as a package at the same time, that the Debtors intended to create a security interest in the described collateral, and that at some point in time the attachment was attached to the security agreement, but that she didn't remember if it was attached at the time the security agreement was executed or later.

FIRSTAR and STARK each attack the other's documentation as being insufficient, while defending the sufficiency of their own. FIRSTAR attacks the documentation of STARK on the grounds that (1) Neither STARK's promissory note nor security agreement includes a land description where the 1993 crops were grown; (2) authorized officers of SIMON KENTON failed to sign the security agreement; (3) STARK's security agreement uses the terms "grain" and "inventories", rather than "farm products"; and (4) STARK's security interest terminated when the debt to it was paid in full. STARK attacks FIRSTAR's documentation on the grounds that the security agreement to FIRSTAR does not contain a description of the land where the 1993 crops were grown. Both defend the sufficiency of their security agreements by relying on all the documentation taken by each of them to establish the existence of valid security agreements.

Section 9–203(1) of the Uniform Commercial Code (CODE) as adopted in Illinois governs attachment of a security interest. It provides in part as follows:

---

1. Part of the box last checked is preprinted as part of the form and part was typed in by the parties. The dark bold print is the preprinted part of the form. The regular print is the part typed in by the parties.

(1) ... [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

> (a) ... or the debtor has signed a security agreement which contains a description of the collateral and in addition when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned;

810 ILCS 5/9–203(1).

The promissory note given to STARK (STARK Ex. # 1) is signed by KEVIN, SHERRY and SIMON KENTON. It is not signed by KEVIN EMERICK. It grants a security interest in growing crops, crops to be grown, government payments, and security granted by any other security agreement. It does not contain a description of the land involved. If the analysis stopped at this point, STARK would not have a security interest in cattle owned by KEVIN or machinery and equipment owned by KEVIN or SIMON KENTON, as the clause granting a security interest does not describe those items of collateral, nor would it have a security interest in growing crops or crops to be grown by KEVIN or SIMON KENTON, as there is no description of the land.

The first security agreement given to STARK (STARK Ex. # 2) is signed only by KEVIN. However, it does grant a security interest in equipment, cattle, inventory, and grains. The space for describing the land is left blank. Again, stopping the analysis, STARK's security interest would have attached to cattle and equipment owned by KEVIN. It would not have a security interest in growing crops owned by KEVIN, as there is no description of the land, or a security interest in any of the listed items of collateral owned by SIMON KENTON, as SIMON KENTON did not sign the security agreement.

■ To overcome these deficiencies, STARK makes two arguments. The first is the composite document theory that a security agreement may be established through all the documentation surrounding a loan transaction. In reported cases where the creditor is relying on multiple documents to establish a security interest has attached, some courts take a strict view, but most courts take a liberal view. In 4 *White—Summers* (West Publishing Co., 1995) *Uniform Commercial Code,* § 31–3, the authors state:

> *Numeric* and *Taylor Mobile Homes* reveal not only a fundamental difference in orientation; they also suggest the importance of careful factual analysis in evaluating alleged multiple-document agreements. The cases and common sense suggest a number of factors relevant to this inquiry. It is more likely that a court will read documents together and hold that they satisfy the objective test of 9–203 when they have been executed as part of a whole, (footnote omitted) they include internal cross references, (footnote omitted) prior course of dealing indicates they should be read together, (footnote omitted) the documents include a financing statement, (footnote omitted) other documents indicate that the parties assumed a security agreement (unsigned) was in force, (footnote omitted) course of performance, (footnote omitted) and testimonial and other nondocumentary evidence shows the parties plainly intended to create a security interest. (Footnote omitted) (Technically, this last factor may not be strictly relevant, for the question is whether the objective *writing* requirement of 9–203 is satisfied.) (Footnote omitted)

Bankruptcy courts construing Illinois law have come to similar conclusions. *See In re Data Entry Service Corp.,* 81 B.R. 467 (Bkrtcy.N.D.Ill.1988).

However, there are limits to the composite document theory. In *In re Martin Grinding & Mach. Works, Inc.,* 42 B.R. 888 (Bkrtcy. N.D.Ill.1984), based upon the collective loan documents, the creditor contended that it had a valid security interest in the debtor's inventory and accounts receivable, even though the document entitled "Security Agreement" did not include those categories. The loan agreement entered into by the parties included inventory and accounts receivable, the debtor's board of directors had authorized the granting of the security interest, and the CODE financing statement filed included those categories in describing the col-

lateral. Reaching its decision against the creditor, the court stated:

> The parties do not dispute that value has been given or that the defendant has rights in the collateral. Nor do the parties dispute that the plaintiff has a valid subsisting security interest in the machinery, equipment, furniture and fixtures of the defendant pursuant to the document entitled "Security Agreement". Furthermore, plaintiff acknowledges the omission of the inventory and accounts receivable from the document entitled "Security Agreement." Therefore, this court must determine whether the document entitled "Security Agreement" solely defines the extent of the security interest of the plaintiff or whether the various loan documents collectively define the security interest.
>
> This jurisdiction and others have adopted the "Composite Document" theory of security agreements which permits a finding of a security agreement through various loan documents. (Citations).
>
> These cases, however, are distinguishable from the case at bar. In the aforementioned cases, no singular document qualified as a security agreement. Consequently, the courts examined the collective loan documents and correspondence in determining whether a security agreement existed. The instant case is distinguishable in that a separate document entitled "Security Agreement" qualified as a security agreement under the Illinois Commercial Code. Therefore, the aforementioned cases did not directly address the issue of whether a security interest is defined by the narrower description in a document entitled "Security Agreement" or whether a security interest is defined by the broader description found in the collective loan documents. Some courts, including the Illinois Appellate Court, have addressed this precise issue. The Illinois Appellate Court in *Allis–Chalmers Corp. v. Staggs,* [117 Ill.App.3d 428, 72 Ill.Dec. 840, 453 N.E.2d 145 (5th Dist.1983) ], held that a security interest is defined by the narrower description contained in a security agreement rather than by the broader description found in a financing statement. In reaching this holding, the court noted that the

security agreement itself creates or provides for a security interest. [UCC § 9–105(1)(I) ]. Moreover, a financing statement serves merely to place third parties on notice that a party may have a perfected security interest in the described collateral. (Citation). In addition, Section 9–201 of the Illinois Commercial Code provides that a security agreement "is effective according to its terms." [UCC § 9–201.] Further, Section 9–203(1)(a) directs that a security interest is ineffective unless the debtor has signed a security agreement which contains a description of the collateral. (Citation). Therefore, a security interest cannot exist in the absence of a security agreement.

Significantly, the comment to Section 9–110 of the Illinois Commercial Code warns that:

> the practitioner should also bear in mind that a difference in the descriptions between the security agreement and the financing statement can lead to serious problems, if the difference involves omission of items of collateral from either document. *The security agreement and the financing statement are double screens through which the secured parties' rights to collateral are viewed, and his rights are measured by the narrower of the two.*

(Citation). In the same manner, where a security agreement clearly grants a specific, unambiguous security interest, parol evidence cannot enlarge the security interest beyond that stated in the security agreement (Citations). One purpose for the formal, requirements of Section 9–203 is to minimize:

> the possibility of future dispute[s] as to the terms of a security agreement and as to what property stands as collateral for the obligation secured.

(Citation). Moreover, the comment to Section 9–101 indicates that the aim of Article 9

> is to provide a simple and unified structure within which the immense variety of present day secured financing transac-

tions can go forward with less cost and greater certainty. (Citation).

This court finds that the document entitled "Security Agreement" unambiguously grants to the plaintiff a security interest in the machinery, equipment, furniture and fixtures of the defendant. To allow parol evidence to alter the unambiguous language of the document entitled "Security Agreement" would undermine the purpose of Section 9–203 and detract from the Article 9 aim of commercial certainty. In light of the dictates of *Allis–Chalmers v. Staggs,* the overall aim of Article 9, the comment to Section 9–203 of the Illinois Commercial Code and the parol evidence rule, the document entitled "Security Agreement" solely defines the extent of the security interest of the plaintiff. Thus, the plaintiff holds a valid subsisting security interest in the machinery, equipment, furniture and fixtures, but not in the inventory and accounts receivable. This court notes that while the collateral loan documents reflect a broader description of collateral, this result:

> is commanded not by fireside equities but by the necessary technicalities inherent in any law governing commercial transactions.... [T]o the extent that the legal significance of documents may be varied and enlarged by other documents evidencing an understanding of the immediate parties to a transaction, we suspect that the law of commercial transactions will not achieve [its] stated purpose. (Citation). (Citations omitted)

On appeal, the Seventh Circuit Court of Appeals affirmed. *Matter of Martin Grinding & Mach. Works, Inc.,* 793 F.2d 592 (7th Cir.1986). Discussing its earlier decision which is cited for the court's adoption of the "composite document" theory, the court stated:

> Furthermore, *Palatine National Bank v. Randall (In re Wambach),* 484 F.2d 572 (7th Cir.1973), on which the Bank relies, is inapposite. We held in *Wambach,* 484 F.2d at 575, that parol evidence may show that a transfer purporting to be absolute was in fact for security, and that an assign-

ment of a beneficial interest, absolute on its face, together with other documents relating to the transaction, may constitute a security agreement. Our holding in *Wambach* that an assignment absolute on its face, other loan documents, and a financing statement may serve as a security agreement in the absence of a document entitled "Security Agreement" in no way suggest that a financing statement and other loan documents might modify an unambiguous security agreement. In deed, the Ninth Circuit reached the same conclusion when faced with the same issue and analogous precedent. *See California Pump & Manufacturing Co.,* 588 F.2d [717] at 720 (holding that parol evidence cannot reform a security agreement and distinguishing *In re Amex–Protein Development Corp.,* 504 F.2d 1056, 1060 (9th Cir.1974)).

Applying the composite document theory to STARK's documentation does not help it. There is nothing ambiguous about the promissory note (STARK Ex. # 1) or the security agreement (STARK Ex.# 2) taken by STARK. They are merely incomplete when compared to the requirements of § 9–203 of the Uniform Commercial Code.

■ Even if the composite document theory were applied to STARK's documentation, the result would be limited. The CODE Financing Statements (STARK Ex. # 3 to 5), signed by KEVIN, SHERRY, and SIMON KENTON, refer to equipment and crops, along with a description of the land. Taking the promissory note, security agreement, and financing statements together, STARK would have a security agreement covering the growing crops or crops to be grown on the land described in the financing statement, owned by KEVIN and SIMON KENTON. In addition, it would have a security agreement covering cattle belonging to KEVIN. However, STARK would not have a security interest in equipment owned by SIMON KENTON, as there is no security agreement signed by SIMON KENTON. While SIMON KENTON signed the promissory note and the financing statements, it did not sign the security agreement.

■ FIRSTAR faces a similar problem, in that its security agreement (FIRSTAR Ex. # 4) does not contain a description of the land. FIRSTAR contends that its entire loan file, taken as a "package" constitutes the security agreement. The conclusions of law set forth above in analyzing STARK's documents are likewise applicable to FIRSTAR's documents. Therefore, this Court also finds that FIRSTAR's security agreement fails to comply with § 9–203(1) and FIRSTAR's security interest in crops did not attach. The security agreement is signed by KEVIN, SHERRY, and SIMON KENTON. It describes the collateral as cattle, equipment, inventory and growing crops. The lack of a description of the land is not cured by referring to the attachment (FIRSTAR Ex. # 30), or the Financing Statements (FIRSTAR Ex. # 5 to 10).

The attachment (FIRSTAR Ex. # 30) is not physically or by written word integrated into the security agreement (FIRSTAR Ex. # 4). It is not attached to the security agreement (FIRSTAR Ex. # 4). FIRSTAR's lending officer's testimony was not unequivocal. While her testimony at one point might be construed to be that the attachment was made at the time of the closing, her testimony at another point was that the attachment was affixed at some later, but unknown time.

Nor can it be determined from the language in the security agreement (FIRSTAR Ex. # 4) and attachment (FIRSTAR Ex. # 30) that the attachment (FIRSTAR Ex. # 30) was affixed at the time of the closing. The blank for filling in the description of the land has no reference to any exhibit. The attachment (FIRSTAR Ex. # 30) consists of three pages. While the first page refers to a security agreement, the next two pages, which contain the descriptions, do not. Furthermore, the first page does not contain any indication as to the number of pages to the attachment, and none of the pages are numbered to indicate a single attachment.

This Court cannot conclude the attachment (FIRSTAR Ex. # 30) was affixed at the closing, as compared to later, or much later, after a deficiency in the documentation was discovered. This result is buttressed by the testimony of KEVIN that the descriptions were given to FIRSTAR at some point after the closing.

In *Garst Seed Co. v. Wilson*, 17 Kan. App.2d 130, 833 P.2d 138, 18 UCC Rep. Serv.2d 943 (1992), the court held that a description of real estate in the financing statement could not cure an omission of the description in the security agreement, stating that it found no authority for merging the two separate documents in order to satisfy the requirements of § 9–203. The same result was reached in *In re Sabelka*, 57 B.R. 972 (Bkrtcy.N.D.Iowa 1986). In *Centerre Bank National Assn. v. Missouri Farmers Assn., Inc.*, 716 S.W.2d 336, 1 UCC Rep. Serv.2d 1356 (Mo.Ct. of App.1986), the court rejected the creditor's contention that additional financing statements filed three months after the security agreement was executed which contained a description of a parcel of real estate which had been omitted from the original security agreement and financing statement, cured any defect. The court stated:

Under the Missouri Uniform Commercial Code, it is the security agreement that "creates or provides for a security interest." [UCC § 9–105(1)(h)]. A financing statement is merely evidence of the creation of a security interest and does not itself constitute a security agreement. *Shelton v. Erwin*, 472 F.2d 1118, 1120 [11 UCC Rep.Serv. 1239] (8th Cir.1973). Hence, other jurisdictions have consistently held that "when a financing statement describes a greater quantity of property than that described in the corresponding security agreement, the security interest is defined by the narrower description contained in the security agreement." [Citing, *inter alia, Allis Chalmers Corp. v. Staggs.*]

Applying the principles set forth above, we hold that [the creditor's] later-filed financing statements could not have enlarged the scope of the original security agreements, and thus [the creditor] did not obtain a security interest in the crops on the [omitted farm.]

■ STARK also argues that because the crops had been harvested, a description of

the land is no longer required in order for its security interest to attach, because the security agreement granted STARK a security interest in "inventory" and "grains." FIRSTAR criticizes STARK's use of the term "grain" as not being a term defined in the CODE, and points to the absence of the term "farm products" in STARK's description of collateral.

Section 9–109 of the CODE, 810 ILCS 5/9–109, divides goods into four categories: "consumer goods," "equipment," "farm products" and "inventory." Under Section 9–109(3), goods are farm products

if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, wool-clip, maple syrup, milk and eggs) or if they are aquatic products as defined in the Aquaculture Development Act, and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming or aquacultural operations. If goods are farm products they are neither equipment nor inventory.

The official comments to the CODE state, and the cases hold, that the classes of goods are mutually exclusive. *In re Houts,* 31 UCC Rep.Serv. 338, 1981 WL 138002 (N.D.N.Y.1981). The official comments to the CODE also state that products of crops remain farm products so long as they are in the possession of a debtor engaged in farming operations and have not been subjected to a manufacturing process.

■ STARK asserts, without analysis or citation of authority, that because the crop had been harvested and sold on the date of bankruptcy, it had become the proceeds of "inventory." As noted above, stored crops which remain in the debtor's possession, are farm products. It is only when the crops are possessed by one not engaged in farming that the classification changes and the crops become "inventory." *In re Tinsley and Groom,* 49 B.R. 85 (Bkrtcy.W.D.Ky.1984). The record is barren of any testimony or documentation that the 1993 crops were stored at an elevator or were possessed by anyone other than KEVIN or SIMON KENTON prior to their sale. STARK made no showing that the 1993 crop ever became "inventory" as that term is defined in the CODE.

In support of its "severed crop" argument, STARK relies on *In re Roberts,* 38 B.R. 128 (Bkrtcy.D.Kan.1984). The court reasoned:

As alluded to by the commentators and as delineated in the UCC, only a security interest in "growing crops" must be perfected by a financing statement containing a description of the real estate. It would appear that a security interest in other subcategories of "farm products," such as severed crops, stored crops, or products of crops in their unmanufactured state, is, by negative implication, perfected without inclusion of a real estate description.

The Court holds that severed crops are not "growing crops", but rather are simply another subcategory of the UCC's generic collateral category of farm products, if in the farm debtor's possession. Because severed crops are not growing crops, the real estate description requirement [UCC § 9–402(1) ] is inapplicable, and in order to perfect a security interest in the severed and stored crop a financing statement does not have to contain a description of the real estate.

. . . .

[The creditor] was granted a security interest in and perfected a security interest in "all farm products." Although a real estate description was omitted in the UCC–1 financing statement, when the crops were harvested and thus ceased to be "growing crops" the real estate description requirements of [UCC § 9–402(1) ] became inapplicable, and [the creditor's] formerly unperfected security interest in "growing crops" became a perfected security interest in farm products … the severed, stored grain. Though this gap in perfection could be a problem under certain circumstances, those circumstances do not exist here.

*Roberts* has been followed in *United States v. Smith,* 832 F.2d 774 (2d Cir.1987); *In re Esparza,* 118 Wash.2d 251, 821 P.2d 1216, 16 UCC Rep.Serv.2d 1217 (1992), *Bank of Cresbard v. Lindhorst Farms, Inc.,* 78 B.R. 1002

(D.S.D.1987); *Matter of Sekutera,* 62 B.R. 387 (Bkrtcy.D.Neb.1986); and *In re Klipfer,* 62 B.R. 290 (Bkrtcy.S.D.Ohio 1986).

*Roberts* and its progeny have not received universal approval, however. Questioning the court's decision in *Roberts,* the court in *In re Waters,* 90 B.R. 946 (Bkrtcy.N.D.Iowa 1988), stated:

This Court has serious reservations about the holding in the *Roberts* case. Real estate descriptions are required to put third parties on notice that the crops growing on that particular parcel of land are encumbered. All growing crops eventually become severed crops. Why require a legal description if it will eventually be unnecessary? Creditors could routinely file financing statements without real estate descriptions and after the crop is severed, claim perfection in any and all crops produced by the debtor. Further, to follow the *Roberts* decision would mean that a secured creditor who properly provided a real estate description on its financing statement could be challenged, once a growing crop is severed, by a second creditor secured only in "farm products" having no property description. Iowa [UCC § 9–312(5) ] establishes priority of conflicting security interests according to time of filing financing statements. Consequently, the creditor properly perfected in growing crops who had included an accurate legal description in its financing statement would lose its priority upon harvest to another creditor who had a security interest in crops (and no legal description) provided that creditor had filed its financing statement before the creditor who had included an accurate legal description. Since it is extremely rare to ever sell growing crops, that is, the crops are almost always harvested prior to sale, it would appear that the *Roberts* ruling would render the legal description requirement a nullity.

In *Western Ohio National Bank & Trust Co. v. Continental Grain Co.,* 33 Ohio App.3d 210, 515 N.E.2d 20, 4 UCC Rep.Serv.2d 1578 (1986), the court reached a similar result, holding that the creditor's lien upon "all harvested and stored grain from [the] 1981 season" was not enforceable because no legal descriptions were included in the security agreement or financing statement. Rejecting the contention that the requirement of a description of the real estate did not apply to harvested crops, the court stated:

The bank argues that there is a difference between a growing and harvested crop, and that a security interest and financing statement covering a harvested crop need not contain the real estate descriptions required by [the UCC.]

We do not suggest the contrary where the security agreement is entered into and the financing statement completed and filed after the crop is harvested and stored. At that point, the lands where the crop was grown become irrelevant with respect to third persons who might thereafter take an interest in the crop.

However, the situation here involves the bank's attempt to take a security interest in a harvested crop before the seed is even in the ground. Under these circumstances, it is obvious to us that the security interest and financing statement "cover crops growing or to be grown."

It matters not that the bank only wanted a security interest in the harvested crop. As a practical matter, the bank was no more interested in the crop as it grew in the field than were the purchasers of the crop, such as Continental and the other defendants.

Because both the farm lender and the crop buyer transact with the debtor-farmer with reference to the harvested crop, but often while the crop is still in the ground, we conclude that the real estate descriptions required of the security agreement by [the UCC] are essential to security agreements made and financing statements filed when the crops are still growing or yet to be grown, if these security agreements and financing statements are to accomplish the attachment and perfection of the lender's intended security interest in the harvested crop.

To conclude otherwise would relegate the real estate description requirements of [the UCC] to situations which, in reality, do not exist.

The bank argues, and we agree, that [UCC § 9–204] permits the acquisition of a security interest in after-acquired property. However, this does not negate the requirements ... of real estate descriptions where the crops are growing or to be grown.

The Editors' note to this decision in the Uniform Commercial Code Case Reporting Service suggests that the difference in the cases lies in whether the security agreement includes a separate category such as after-acquired "farm products" independent from the description of the specific growing crop.

In this Court's view, the *Smith/Roberts* line of cases should not be followed. Applying the reasoning in *Western Ohio, supra*, STARK's security interest did not attach to the 1993 crops because the security agreement (STARK Ex.# 2) was entered into before the crop was planted and failed to contain a description of the real estate.

■ Next, this Court needs to consider whether the result as to STARK should be changed because of the second security agreement (STARK Ex.# 34). It should not. The analysis starts with the observation that the second security agreement consists of a preprinted portion and portions added by the parties. The preprinted portion grants a security interest in "farm products". If the analysis stopped here, STARK's security interest in harvested crops would have attached under the "farm products" description. However, the language added by the parties also has to be given effect. As a matter of contract construction, added language prevails over the boilerplate language of a preprinted form. *In re Octagon Roofing*, 124 B.R. 522 (Bkrtcy.N.D.Ill.1991). The added language has two consequences. First, it does not add a new class of collateral, but qualifies the collateral description for "farm products." Second, its application is to the 1994 crop year. As the crops in dispute are for the 1993 crop year, the second security agreement applicable to the

1994 crop year (STARK Ex.# 34) has no effect on the 1993 crop.

At this stage of the analysis the order of priority would be:

STARK: First on cattle and equipment owned by KEVIN. No security in equipment owned by SIMON KENTON. No security in crops owned by KEVIN or SIMON KENTON.

FIRSTAR: First as to equipment owned by SIMON KENTON, and second on cattle and equipment owned by KEVIN, and no security on crops owned by KEVIN or SIMON KENTON.

PHI: First as to crops owned by SIMON KENTON.

■ To avoid this order of priority, both STARK and FIRSTAR attempt to claim a security interest in collateral owned by debtors who have not signed security agreements. Under § 9–203(1)(a) of the CODE, in order for a security agreement to be deemed valid, it must be signed by the debtor. 810 ILCS 5/9–203(1)(a). STARK argues that when KEVIN signed the security agreement he intended to sign on behalf of SIMON KENTON. In support of this argument STARK cites *In re Mid–Atlantic Piping Products of Charlotte, Inc.*, 24 B.R. 314 (Bkrtcy.W.D.N.C.1982). In that case, although the debtor/corporation signed a promissory note, the security agreement was signed by the debtor's president without mention of the debtor's name or express reference to any official or representative capacity. Financing statements were filed in the debtor's name properly signed by the debtor's president. Despite what the court termed "erratic" documentation, the court found in the creditor's favor, finding that resort to extrinsic evidence was permitted under applicable state law, and in the alternative, under a vagrant application of the "composite document" theory[2], that the requirements of CODE § 9–203(1)(b) had been complied with.

A similar result was reached by the court in *In re Great Basin Transport, Inc.*, 32 B.R.

---

2. The court states that "Courts in a number of jurisdictions have concluded that an issue concerning compliance with the requirements of [UCC] § 9–203(1)(b) is often a matter which re-

quires consideration of a group of documents taken together." This approach overlooks the fact that there was a separate document entitled "security agreement."

365 (Bkrtcy.W.D.Okla.1983). In holding that documents may be considered *in toto* under § 9–203, the court found an ambiguity in the security agreement itself, stating that it defined "debtor" to include both individuals and the corporation but that the agreement was signed only by corporate officers in their individual capacity.

Other courts have not been so receptive when it comes to § 9–203. In *In re Rex Printing, Inc.,* 14 B.R. 403 (Bkrtcy.N.D.Ind. 1981), the court held in favor of the trustee and against the creditor where the debtors had signed a security agreement in their individual capacity after incorporation of their business. The court noted that the financing statement had been filed under the name of the corporation, thereby establishing that the creditor knew of its existence. The court held that even though the creditor had a properly filed financing statement, its secured status is solely and ultimately determined by the validity of the underlying security agreement.

Where, as in this case, there is only one signature and there is no mention of SIMON KENTON in the security agreement itself, this Court cannot find, based upon KEVIN's testimony, that KEVIN intended to sign the security agreement in dual capacities. KEVIN and SIMON KENTON, though closely related entities, operated separate and distinct farming endeavors. Thus the present case is unlike those involving a unitary business, where the signature of a corporate officer in his individual capacity has been held effective to create a security interest in the corporation's assets. For reasons stated previously, the composite document theory cannot be applied to create a security agreement from the promissory note and financing statement, because a separate document entitled "Security Agreement" exists. STARK was aware of the existence of SIMON KENTON and simply failed to obtain proper documentation.

FIRSTAR argues that it has a security interest in equipment owned by KEVIN EMERICK even though it has no documentation against it. FIRSTAR asks this Court to pierce the corporate veil, to find KEVIN the alter ego of KEVIN EMERICK. There are several reasons why that argument cannot be sustained.

■ First, the various bankruptcy cases were filed on September 26, 1994. On October 3, 1994, the Debtors filed a motion for joint administration, seeking to have hearings on motions in all cases heard at the same time. On November 10, 1994, an order was entered joining the cases for administrative and procedural purposes only and the Debtors filed an amended motion, seeking substantive consolidation. The Debtors alleged that the creditors of each of the debtors dealt with the debtors as if they were a single economic entity, specifically referring to FIRSTAR and STARK. The U.S. Trustee filed an objection and a hearing was held at which time the Court rejected the contention that the Debtors were one and the same. An order was entered on January 4, 1995, which provided:

1. Each of the above named Debtors' schedules of assets and liabilities are different than those of the other two above named debtors.

2. Substantive consolidation would be prejudicial to the rights of unsecured and undersecured creditors of the respective debtor-in-possession estates if the assets and liabilities of each debtor-in-possession were consolidated with the other two debtor-in-possession estates.

3. Substantive consolidation could be prejudicial to a chapter 7 trustee and other parties in interest in the event one or more of the above named cases is converted to a chapter 7 proceeding.

■ A bankruptcy court's power to substantively consolidate cases has been likened to the ability to pierce the corporate veil of separate corporations. *James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.),* 517 F.2d 997 (2d Cir.1975); *Eastgroup Properties v. Southern Motel Assoc., Ltd.,* 935 F.2d 245 (11th Cir.1991). But both are used sparingly. *Eastgroup Properties, supra; Ernst v. Parkshore Club Apartments Ltd. Partnership,* 863 F.Supp. 651 (N.D.Ill.1994).

■ This Court's previous ruling that the cases should not be substantively consolidat-

ed should govern here. The "law of the case" doctrine precludes reconsideration of an issue previously decided. In *In re Martin*, 142 B.R. 260 (Bkrtcy.N.D.Ill.1992), Judge Schmetterer discussed this doctrine, stating:

> Under [the "law of the case"] doctrine, a decision made at one stage of a proceeding should continue to govern the same issues in subsequent stages of the same proceeding. *Redfield v. Continental Cas. Corp.*, 818 F.2d 596, 605 (7th Cir.1987). The doctrine applies to issues that "were decided either expressly or by necessary implication." *Parts and Electric Motors, Inc. v. Sterling Electric, Inc.*, 866 F.2d 228, 232 (7th Cir.1988) *cert. denied*, 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989). A court should apply the doctrine unless there are unusual or compelling circumstances which mandate otherwise. *Electric Motors* at 231. Such circumstances include "(1) substantial new evidence introduced after the first review, (2) a decision of the Supreme Court after the first review that is inconsistent with the decision on that review, and (3) a conviction on the part of the second reviewing court that the decision of the first was clearly erroneous." *Id.* at 231.

FIRSTAR's argument for piercing the corporate veil is largely based upon the tapes of the § 341 meeting. These are not "new" evidence as they were available at the time the motion to substantively consolidate was heard. In effect, the parties are seeking a "partial" substantive consolidation. To treat the Debtors as one for purposes of this adversary proceeding, but not for the main cases, would be unfair. They either are the same, and should be treated the same for all purposes, or they are not and they should not be treated as the same for any purpose.

 The second reason why FIRSTAR's argument for piercing the corporate veil cannot be sustained is that debtors engaged in no wrongful activities, nor did they perpetrate any fraud. Black's Law Dictionary defines the term "piercing the corporate veil" as:

> Judicial process whereby court will disregard usual immunity of corporate officers or entities from liability for wrongful corporate activities; e.g. when incorporation exists for sole purpose of perpetrating fraud. The doctrine which holds that the corporate structure with its attendant limited liability of stockholders may be disregarded and personal liability imposed on stockholders, officers and directors in the case of fraud or other wrongful acts done in the name of corporation. The court, however, may look beyond the corporate form only for the defeat of fraud or wrong or the remedying of injustice.

Black's Law Dictionary defines the term "alter ego" as:

> Second self. Under doctrine of "alter ego", court merely disregards corporate entity and holds individual responsible for acts knowingly and intentionally done in the name of corporation. To establish the "alter ego" doctrine, it must be shown that the stockholders disregarded the entity of the corporation, made corporation a mere conduit for the transaction of their own private business, and that the separate individualities of the corporation and its stockholders in fact ceased to exist. The doctrine of "alter ego" does not create assets for or in corporation, but it simply fastens liability on the individual who uses the corporation merely as an instrumentality in conducting his own personal business, and that liability springs from fraud perpetrated not on the corporation, but on third persons dealing with corporation.

Black's Law Dictionary defines the "instrumentality rule" as:

> Under this rule, corporate existence will be disregarded where a corporation (subsidiary) is so organized and controlled and its affairs so conducted as to make it only an adjunct and instrumentality of another corporation (parent corporation), and parent corporation will be responsible for the obligations of its subsidiary.

> The so-called "instrumentality" or "alter ego" rule states that when a corporation is so dominated by another corporation that the subservient corporation becomes a mere instrument and is really indistinct from controlling corporation, then the corporate veil of dominated corporation will

be disregarded, if to retain it results in injustice.

In *In re Scott*, 113 B.R. 516 (Bkrtcy. W.D.Ark.1990), the court rejected the application of an "alter ego" theory in a CODE situation, stating:

> Most of the cases which validate the existing security interest in the after-acquired collateral of the transferee appear to disregard the fact that the transferee is a separate entity which has not granted a security interest to the transferor's creditor. The transferee is typically owned by the former debtors. One commentator argues that the security interest in the transferor's after acquired property ought to be validated under this so-called alter ego theory because this interpretation of section 9–402(7) produces a better result even though it requires the law to indulge in a legal fiction.
>
> While no satisfactory resolution of this issue may exist, the language of section 9–402(7) cannot properly be construed to dispense with the specific requirements of section 9–203(1) because, as [a commentator] points out, section 9–402(7) "assumes the existence of a Security interest to perfect." [Burke, *The Duty to Refile Under Section 9–402(7) of the Revised Article 9*, 35 Bus.Law. 1083, 1094 (1980)]. Nor can the requirements of section 9–203(1) be met by employing a legal fiction that the new corporation is not a separate entity. Under state law, a corporate entity may be disregarded in appropriate circumstances, but here no allegation was made that the corporate entity should be disregarded and no facts warranting such action were shown. To require a searcher to determine to what extent a debtor entity is owned or controlled by owners of the transferor debtor would render the filing system of Article 9 unreliable. The potential structural variations of the new debtor are infinite.

Quoting from *Burke* by footnote, the court stated:

> If transfers are disregarded because of the management or ownership similarities of the transferor and the transferee, it will never be possible to determine how much change in ownership, control or business activity will result in recognition of the separate legal status of the transferee for purposes of creating and perfecting a security interest in the assets of the transferee. It is apparent that alter ego as a refiling theory is incompatible with the purpose of the filing rules of article 9 since it will not produce uniform filing or search rules that can be safely relied upon in structuring secured transactions. Burke, *supra*, at 1092.

If FIRSTAR is concerned about equipment originally subject to the security agreement signed by KEVIN and SIMON KENTON, a conveyance to KEVIN EMERICK, without FIRSTAR's knowledge or consent, cannot destroy FIRSTAR's security interest. If FIRSTAR is concerned about new equipment subsequently acquired by KEVIN EMERICK, FIRSTAR was expected to police the total operation and take new documentation as to new equipment obtained by a new entity.

Again quoting from *Burke*, the court in *Scott* discusses new equipment in the hands of a transferee:

> With respect to new property acquired by the transferee, the secured creditor must establish both the existence of security interest in the property and perfection of the security interest. Assuming that the secured creditor can establish the existence of a security interest in the property acquired by the transferee, the last sentence of section 9–402(7) clearly does not operate to perfect the security interest. The new property acquired by the transferee is by definition not "collateral transferred by the debtor," within the meaning of the last sentence of section 9–402(7); and a financing statement filed in the name of the transferor can not perfect a security interest in property acquired by the transferee. *As to new property acquired by the transferee after the transfer, the secured creditor should obtain a new security agreement signed by the transferee and file a new financing statement signed by the transferee.*

Burke, *supra*, at 1100 (emphasis added) (footnotes omitted).

In summary, there was no showing of wrongful or fraudulent activity by the Debtors. If FIRSTAR had a valid security agreement on equipment, it could not be defeated by a subsequent transfer of the equipment to KEVIN EMERICK. If new equipment was acquired, FIRSTAR apparently failed to monitor the situation and take new documentation.

There is an underpinning which runs throughout this Opinion and the cases upon which this Court relies in reaching its result. The CODE sets out the rules to be followed in the commercial world. While in a sense these rules, in some instances, may appear to be somewhat arbitrary in nature, they are a practical set of rules which the players in the commercial world developed and are expected to play by. The rules are made known and the players are expected to abide by them. Once exceptions are created based upon a liberal interpretation of the CODE and the equities of a particular case, the exceptions would overwhelm the rules. The predictability and finality sought by the commercial world would be lost. Admittedly, it is a harsh result when a player, intending to achieve a particular result, loses because he didn't follow the rules. But that is the result if the system is to provide the certainty sought by the commercial world through the CODE.

In this case, to accept STARK or FIRSTAR's position would result in the exceptions overwhelming the stated rules found in the CODE. This Court cannot redraft the documents for STARK and FIRSTAR. Displaying no sympathy for a bank's failure to draft its security agreement to include PIK payments, the Seventh Circuit Court of Appeals stated:

> We also cannot accept the district court's contention that finding for the debtors will create an unintended potential for fraud. The court stated, "If PIK payments were not proceeds, a farmer could abandon all farming activities in favor of program participation, thereby allowing him to dissipate the proceeds of the programs without any regard for his creditors' interests." This argument can be made anytime a farmer finds a substitute use of

his land, such as using his fields for a rock concert or a fair ground instead of for the growing of crops. Clearly, income derived from such alternative uses could not be considered crop proceeds. Moreover, banks can easily avoid such potential losses of collateral by careful drafting, *see In re J. Catton Farms, Inc.,* 779 F.2d 1242, 1245 (7th Cir.1985), and we see no good reason to apply unjustifiably loose constructions to documents of this kind. Even if this particular PIK program was new, land diversion programs and federal subsidies of this sort to farmers have been commonplace for years. *Cf. Matter of Binning,* 45 B.R. 9, 12–13 (Bankr.S.D.Ohio 1984) ("Land diversion programs have been in existence in one form or another since at least 1949. As a federally chartered instrumentality, operating under the auspices of the farm credit administration ... the [bank] could hardly claim to be ignorant as to the existence or nature of these programs; nor could it claim to be unversed in drafting security agreements which adequately describe government entitlements as collateral.") The bank could presumably have acquired an interest in PIK revenues either by referring to government entitlements directly or by including a reference to general intangibles or to contract rights. *See In re Sunberg,* 35 B.R. 777 [Bankr.S.D.Iowa 1983]. Since the Bank did none of these things, the district court was incorrect in granting it the right to the Schmaling's PIK payments.

*In the Matter of Schmaling,* 783 F.2d 680 (7th Cir.1986).

FIRSTAR also takes the position that STARK's security interest terminated as to all collateral when the Debtors' balance at STARK reached zero. The basis of FIRSTAR's position is a provision in the security agreement that provides as follows:

> This agreement and the security interest in the collateral created hereby shall terminate when the obligations have been paid in full.

and that by previous actions STARK indicated that the account balance reached zero, which it is now collaterally or judicially es-

topped to deny. STARK responds by contending that the account never was fully paid, that its previous actions were based on a mathematical error, and that collateral or judicial estoppel have no application. STARK also responds by contending that even if the account was fully paid, the security interest reattached when additional credit was extended.

The facts underlying this issue are as follows. In 1992, 1993 and 1994, STARK provided product to the Debtors. Sometime in 1994 STARK prepared a ledger showing the value of product supplied and payments received. (FIRSTAR Ex. # 20). The ledger shows that during the period of February 5, 1993, to July 2, 1993, the Debtors were out of debt to STARK. In June of 1994, STARK sued the Debtors in state court and a stipulated judgment was entered based on the ledger calculations. After the judgment was entered the Debtors filed their Chapter 11 cases and STARK filed a proof of claim also based on the calculations shown on the ledger.

FIRSTAR and STARK agree that the four requirements for collateral estoppel are: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom the estoppel is invoked must be fully represented in the prior action. *See Klingman v. Levinson*, 831 F.2d 1292 (7th Cir.1987). They disagree over their application. For the following two reasons, this Court finds that collateral estoppel is not present.

First, the issue must be actually litigated. A stipulation does not meet this requirement. Discussing this element, the court in *Klingman* stated:

The only remaining question is whether stipulations entered into as part of a consent judgment satisfy the requirement that the issue be "actually litigated." One bankruptcy court has stated, citing *Moore's Federal Practice,* that "collateral estoppel is inappropriate when the prior judgment was a consent judgment ... without any hearing or determination of the merits by the court itself." *In re Hunter,* 17 B.R. 523, 526 ([Bankr.] W.D.Mo.1982). However, the full quotation from [*Moore's*] states that: "Justice, then is probably better served if the principle of collateral estoppel does not apply to unlitigated issues underlying default or consent judgments, or to issues determined by the parties, *unless it can be said that the parties could reasonably have foreseen the conclusive effect of their actions.*" (Citations). As stated in *Kasper Wire Works, Inc. v. Leco Eng'g & Mach., Inc.,* 575 F.2d 530 (5th Cir.1978), if the parties to a consent decree "indicated clearly the intention that the decree to be entered shall not only terminate the litigation of claims but, also, determine finally certain issues, then their intention should be effectuated." (Citations).

More recently, in *Meyer v. Rigdon,* 36 F.3d 1375 (7th Cir.1994) the 7th Circuit restated the rule:

Consent decrees, "while settling the issue definitively between the parties, normally do not support an invocation of collateral estoppel." (Citations). "The rationale behind this general rule is that issues underlying a consent judgment generally are neither actually litigated nor essential to the judgment." (Citation). Collateral estoppel may only be applied to consent decrees if "'the parties could reasonably have foreseen the conclusive effect of their actions.'" (Citations). *See also* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4443, at 382 (1981) ("Issue preclusion does not attach unless it is clearly shown that the parties intended that the issue be foreclosed in other litigation.")

In the present case, there is no such indication contained in the Stipulation for Entry of Judgment. While the judgment is *res judicata* between the parties to the state court action, i.e. the Debtors and STARK, it goes way too far to say that an interim amount shown to be due and owing on a certain date on an exhibit was conclusively determined.

Second, the determination of the issue must have been essential to the final judgment. In the state court action the essential issue was how much was owed at the time on the judgment, not whether at some point in time prior thereto the amount owed reached zero.

■■■ Nor is judicial estoppel applicable. This Court cannot disagree with FIRSTAR's statement of the applicable law when FIRSTAR states:

Judicial estoppel may come into operation when collateral estoppel and *res judicata* are technically inapplicable. Judicial estoppel is the doctrine that prevents a party that has successfully assumed one position in a legal proceeding to later assume a contrary position merely because its interests have changed. [*In re*] *Direct Air*, 189 B.R. [444] at 453 [Bankr.N.D.Ill. 1995]. Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process. It is to be applied where intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum designed for suitors seeking justice. Estoppel is an equitable concept, and its application is therefore within the court's sound discretion. It should not be used where it would work an injustice, such as where the former position was a product of inadvertence or mistake. *Matter of Cassidy*, 892 F.2d 637, 641–642 (7th Cir.1990).

Discussing that doctrine in *Cassidy*, 892 F.2d 637 (7th Cir.1990), the court stated:

Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process. It is to be applied where "intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum designed for suitors seeking justice," to prevent litigants from "playing fast and loose with the courts." "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interest have changed, assume a contrary position." The doctrine of estoppel is intended to protect the courts

rather than the litigants, so it follows that a court, even an appellate court, may raise the estoppel on its own motion in an appropriate case.

"The circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any formulation of principle," but may be used where collateral estoppel and equitable estoppel fail to protect the interest the rule is intended to serve. Although this court has never applied the doctrine, we have identified certain limitations on its application. [W]e [have] held that the estoppel may be applied only where a clearly inconsistent position is taken. In that case we held that the plaintiff's position in a 1961 lawsuit asking that a trust instrument be modified to allow the trustee more flexibility in investing the trust corpus was not clearly inconsistent with its position in a 1972 lawsuit charging the trustee with mismanagement of the trust. Another limitation was identified in *Eagle Foundation v. Dole*, 813 F.2d 798, 810 (7th Cir.1987), where we required that the party to be estopped have convinced the court to accept its position in the earlier litigation. A party is not bound to a position it unsuccessfully maintained.

In concluding, the court stated:

Estoppel is an equitable concept, and its application is therefore within the court's sound discretion. (Citation). It should not be used where it would work an injustice, such as where the former position was the product of inadvertence or mistake, *Hamilton v. Zimmerman*, 37 Tenn. (5 Sneed) 39, 49 (1857); *Johnson Serv. Co. v. TransAmerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir.1973) ("the rule looks toward cold manipulation and not an unthinking or confused blunder"); or where there is only an appearance of inconsistency between the two positions but both may be reconciled. (Citations omitted).

But this Court does disagree with its application to the facts of this case. There is no showing STARK engaged in any devious con-

duct intended to pervert the judicial process. It simply made a mathematical mistake which resulted in an interim reduction of the Debtors' balance to zero. That mistake should not be used to deny its otherwise rightful claim to their collateral.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

## ORDER

For the reasons set forth in the Opinion entered this day IT IS HEREBY ORDERED that the following creditors hold valid secured claims against the following property of KEVIN EMERICK, individually and against SIMON KENTON:

1. PROCEEDS of 1993 CROPS owned by KEVIN EMERICK, individually: unencumbered.

2. EQUIPMENT and MACHINERY owned by KEVIN EMERICK, individually: First lien, STARK; second lien, FIRSTAR.

3. LIVESTOCK owned by KEVIN EMERICK, individually: first lien, STARK; second lien, FIRSTAR.

4. EQUIPMENT and MACHINERY owned by SIMON KENTON: first lien, FIRSTAR; second lien, STARK.

5. PROCEEDS of 1993 CROPS owned by SIMON KENTON: first lien, PHI.